*In re* WILLIAMS' ESTATE.

1. STATUTE OF FRAUDS—VERBAL CONTRACT TO CONVEY LANDS—PARENT AND CHILD—EVIDENCE.

A verbal contract by a mother to convey land to her adopted child in consideration of services to be rendered by the latter, though void under the statute of frauds, may be resorted to, in an action to recover for such services, for the purpose of negativing the presumption that they were gratuitously rendered, at least if there have been such acts of part performance as would entitle the plaintiff to equitable relief.

2. ESTATES OF DECEDENTS—CLAIM FOR SERVICES.

Where a promise is made to compensate for services by will, and the promisor dies without so providing, the value of the services may be recovered as a claim against the estate.

Error to Kent; Grove, J. Submitted January 31, 1895. Decided October 1, 1895.

Sophia Williams presented a claim against the estate of Marie L. Williams, deceased. The claim was allowed by the commissioners, and the administrator, Byron L. Ransford, appealed to the circuit court. From a judgment for claimant, the administrator brings error. Affirmed.

*Mark Norris*, for appellant.

*W. W. Mitchell (Claude R. Buchanan,* of counsel), for appellee.

McGRATH, C. J.   This is an appeal by the administrator from the allowance of the claim of Sophia Williams. The claim as presented to the commissioners was as follows:

"The said Sophia Williams avers and claims damages in the sum of $30,000 for the nonfulfillment of a verbal contract made and entered into by and between herself, the said Sophia Williams, and the deceased, said Marie Williams, in substance and effect as follows:   Said claimant avers that she is now a citizen of the United States, and a resident of the county of Kent, State of Michigan, and is 43 years of age; that she was born in Germany, and came to this country, with a widowed mother, when she was seven years old; that when she was 13 years old she went to live with Thomas R. Williams and the said Marie Williams, who were husband and wife, and resided on a farm near Battle Creek, Mich.; that she went to live with said Thomas R. Williams under a written contract made between her mother and the said Thomas R. Williams that she, said Sophia, should stay and reside with them until she became 18 years of age, in consideration of which they were to board her, school her, and, when she became 18 years of age, give her a cow and some other personal property; that said Thomas R. Williams and Marie Williams had no children, and that she lived with them, and took their name, in accordance with said contract, and that during said time she was treated by them in every respect as they would treat their own child; that, after she became 18 years of age, she still continued to reside with them, they having in the meantime moved onto a farm in Kent county, hereinafter more particularly described; that said Thomas R. Williams became blind, and subsequently insane, and died in the insane asylum at Kalamazoo in February, 1872; that at the time of his death, deceased, Marie Williams, was the owner of the farm on which they resided, of about 140 acres, described as follows:   East half of south-east quarter; the south-west quarter of the south-east quarter, and the south half of the north-west quar-

ter of the south-east quarter of section four, town six
north, range eleven west; that there was about 50 acres
of said land improved for cultivation, with ordinary farm
buildings, the remainder of the land being timbered land,
uncleared and uncultivated, upon which farm was a mort-
gage of $800, with some accrued interest, and said Marie
Williams was owing at that time some ten or twelve hun-
dred dollars of debts, which she had contracted in taking
care of and providing for her husband prior to his death,
and that the farm was at that time of the value of about
six or seven thousand dollars. She had no other means,
and but a very little personal property on the farm. She
proposed to sell a portion of the farm sufficient to pay the
indebtedness she had contracted in taking care of her
husband, and clearing the balance of the farm of the
mortgage of $800. That the said Sophia claimed that by
the united efforts of both of them they could pay those
debts, and save the farm as a home for both of them;
and that said Marie Williams and the said Sophia Wil-
liams then and there, soon after the death of said
Thomas R. Williams, entered into a contract or agree-
ment by which they agreed that they should live together,
work together, employ all their energy, knowledge, infor-
mation, and ability, as long as they should live, and put
the same into one common fund, try to pay off the in-
debtedness on the farm, and keep the same, and any
property that they might acquire, for the joint benefit
of the two, and that they should be joint owners of the
farm and all the property that they might acquire, and
at the death of either the other should be absolute owner
of the whole.

"The said claimant avers that each in good faith went
to work with all their energy and perseverance they
both possessed, and managed their affairs with all the
energy, skill, and economy they possessed; that by their
joint efforts they paid off said mortgage and said in-
debtedness which existed at the time of the making of
said contract. They cleared and improved 50 or 60 acres
more of the farm, kept cows, sold milk and butter, raised
stock, horses, and other things, until Marie Williams died
on or about April, 1892, at which time they had said farm
cleared from debt. They had horses, cows, hogs, hay
and grain, farming tools, and everything usually owned
and possessed by farmers in this country, used and em-
ployed in the management of a farm of that character.

They had also, from their saving, acquired money which they had on interest, amounting to over $12,000. That the farm property, notes, and accounts during said time were all kept and carried out in the name of the deceased, Marie Williams, although that, upon the death of either, the survivor would be the owner of the whole; and that the said Marie Williams repeatedly promised the said Sophia Williams that by will or otherwise she would fix their property so that claimant, Sophia, would be the owner of the whole of it in case the said Marie should die first. The said Sophia Williams avers that she has in all things fully, particularly, and completely carried out her said contract, and was entitled in law and equity, upon the death of said Marie Williams, to be the absolute owner of all the estate and all the property rights in action that they possessed. The said Sophia Williams further avers that she firmly believes that she, Marie Williams, always intended to carry out and fulfill said agreement, but that she was taken sick, and by becoming unconscious some days before her death, and thereby failed to carry out said agreement. * * *

"Claimant therefore avers that the property possessed by them, real, personal, and rights of action, was of the value of $30,000 and upwards, and that she is entitled to recover of and from said estate, as damages for the nonfulfillment of said contract, the sum of $30,000, and she therefore prays this claim may be allowed by said commissioners. She also makes a further claim for services performed by her for said Marie Williams during her lifetime for 20 years and upwards, and claims for such services the sum of $30,000."

The decedent left an estate which inventories at $28,394, of which $15,000 was real estate, and the balance personalty. The testimony offered by claimant tended to support the claim made. The jury gave a verdict of $14,500, but, upon a motion for a new trial made by the estate, such new trial was granted, unless claimant would remit $4,500, and the claimant elected to remit. The estate appeals.

The court instructed the jury that claimant was, under the testimony, a member of the Williams family and household; that the rules applicable to services rendered

by a child to a parent controlled; that there could be no recovery in the absence of an express promise to pay; that—

"The single question is: Was there a promise by the deceased, Marie L. Williams, to pay the claimant for her services, in consideration that she should remain with her, and render the services which she claims she has rendered during the life of Mrs. Williams, as long as they both should live, and to pay for those services by a provision, by will or otherwise, so that the claimant would receive the fruit thereof upon her death? And, in order to warrant you in finding that there was such a promise, it is necessary for you to keep in mind the rule of law; and it is a rule of law that the testimony to support such a promise, to warrant the finding of such a promise, must be clear, distinct, and unambiguous; that it must lead your minds clearly to the conclusion that there was such a promise.

"Now, this contract set up by the claimant in her amended claim is void. It is made so by statute. It covered an interest in real estate, and by the statute it was invalid. There was no writing. It could not be a valid agreement unless it was reduced to writing, or some note or memorandum of it made, signed by the party to be charged, to wit, Mrs. Williams; and none such exists. There can be no recovery, then, upon that amended claim, upon that contract set forth in the amended claim. Neither can you resort to it, if you find the claimant entitled to recover, in order to measure the amount that you should award. That disposes of that agreement. * * *

"Now, a person may make an agreement to compensate another in that way for services. It was competent for Mrs. Williams to agree, if you find that she did agree, to make provision in her will for the claimant as compensation for the services that she should render. It would be a valid agreement, to the extent, at least, of determining the question whether or not there was a promise to pay for services. It would not be an agreement, however, that would be the basis of an action. Neither could there be any recovery for the services except upon the *quantum meruit*, as it is termed in the law; that is, upon a count framed for the purpose of recovering for services so much as they should be reasonably

worth. And the only resort that could be had to an agreement to provide compensation by will would be for the purpose of determining whether or not there was a promise to compensate for the services. * * * 1 understand the rule of law to be that the claimant cannot recover in this case unless the proofs show that there was an express promise to pay for the services, but that that fact may be shown by facts and circumstances which satisfy the jury, under the rule that I have given you in regard to the nature of the evidence that should be required, that the services were rendered in the expectation on the part of the claimant that she was to be compensated therefor, and in the expectation on the part of the deceased that she was to pay for them, and that that expectation rested upon an understanding of the parties that there was a legal liability and a legal obligation. I do not understand that it is necessary to find that there was any agreement to pay any specific wages, or any specific amount. If there was an agreement to pay,—if the jury find that there was a promise to pay,—then it will be your duty to ascertain the amount from the evidence which the claimant is entitled to receive, and that amount is such sum as her services were reasonably worth.

"If you should find that the claimant is entitled to recover under the rules that I have given you and under the evidence in the case, it will be proper for you to consider the nature of the services that she rendered, any skill and ability which she brought to her service that resulted in the addition of profits to the deceased, and any faithfulness or special zeal that she manifested in the conduct of the business, so far as it was intrusted to her, —so far as she had any management of it,—whatever the facts may be, and all other facts and circumstances connected, as shown by the evidence. All of these things are to be considered in determining the value of her services. But you have not any right to go beyond what would be reasonable compensation for her services. You should be governed entirely by the evidence in the case. * * *

"It is not sufficient to show that there was a general expectation or intention on the part of the deceased to leave something to claimant by her will, or provide for her by will, and that claimant expected to receive something, or be provided for by will. Such intention on the

part of the deceased, if it existed, is like a will itself,—of such a nature that deceased could change it at any time during her lifetime; and claimant would have no claim for such change of intention, unless there was an express promise, definite and certain, founded upon consideration, to leave such a will in claimant's favor.

"If the claimant is entitled to recover at all, she can only recover the actual intrinsic value of her services for the time they were rendered, and according to their kind and character, without reference to the alleged contract or the value of the property which Mrs. Williams had at her death.

"The nature of the relation shown to exist between claimant and deceased requires the contract claimed to exist between them to be proved by a kind of evidence that is very different from that which may be sufficient between strangers. It must be direct, positive, express, and unambiguous; that is, incapable of more than one construction. The terms must be clearly defined, and all acts necessary for its validity must have special reference to it, and nothing else. I do not understand that the word 'terms' there includes, or is intended to include, the fixing of the price. I have directed you that no price need be fixed, if the other terms existed. It appearing that Sophia Williams was living with Mrs. Williams as her daughter,—in other words, that the relation of parent and child existed,—there can be no agreement implied that claimant was to receive compensation for her services. If you find that the claimant worked or performed services, trusting to the generosity of Mrs. Williams to reward her by will or otherwise, this does not establish any contract to pay her for her services, and upon such a state of facts alone the claimant cannot recover in this action; that is, if there was no promise. The jury cannot find that there was a contract between Mrs. Williams and the claimant to pay for claimant's services merely from a violation of a void contract set up in claimant's first count or claim. Neither can the jury find that there was an agreement between Mrs. Williams and claimant to pay for claimant's services from the fact that Mrs. Williams expected to compensate claimant for her services by will, and claimant expected that Mrs. Williams would reward by will in such sum as Mrs. Williams should think proper. There must be something more, as I told you; that these expectations must rest

upon some promise, upon some legal liability. To constitute a contract it is necessary that the minds of the two parties meet upon something certain and definite; and certain loose statements, expressions, or intentions of one party as to what she expects to do, or expectations on the part of the other party that something would be done for her benefit, do not constitute, of themselves, a contract.

"If the jury find that the claimant performed valuable services for decedent, from which services decedent received substantial benefits, from the spring of 1873 until the time of her death, in April, 1892, under a promise made by decedent to her that she should be rewarded for such services at the death of decedent, by will or otherwise, claimant is entitled to recover what such services so rendered by her are reasonably worth."

It is contended by counsel for the estate that it was conceded that claimant was, during all the time for which she claims compensation, a member of decedent's family, and that they stood towards each other in the relation of parent and child; that when such relationship exists no promise to pay for services will be implied; that an express promise must be shown by clear and positive legal evidence; that the testimony tended to prove but one contract; that such contract was entire; that it was illegal and void under the statute of frauds; that a contract void under the statute of frauds is a mere nullity, and cannot be made use of to establish an express contract to pay for services, nor is evidence of it admissible as bearing upon the services rendered.

The statute was intended to prevent fraud by setting up and enforcing by parol proof simulated contracts. It has frequently been held that no action can be maintained upon a contract which is within the statute; that it cannot be the basis of a recovery; and many cases hold that it cannot be resorted to as fixing the measure of damages. But it may be resorted to for the protection of the party sought to be charged. In a case where a recovery is sought for services performed, it has uniform-

ly been held good as a contract of hiring; and there can
be no doubt but that it may be resorted to as negativing
any presumption that the services were intended to
be gratuitous. In *Philbrook* v. *Belknap*, 6 Vt. 383, plain-
tiff agreed to serve defendant for three years for a stated
monthly compensation, but, after serving six months, he
left defendant's service, and sued to recover *pro rata*
for his services. The court held that, although the con-
tract was within the statute, yet defendant might pro-
tect himself under its terms. The court say:

"If the defendant had sued the plaintiff for not per-
forming the contract in not serving the full period, the
case would be open to a defense under that statute; the
contract being, to the purposes of such a suit, executory,
and the attempt being to sustain an action on it as such.
But in this case the contract, so far as the service has
been performed, is executed, and is relied on as regulating
and determining the right of the plaintiff to compensa-
tion for what has been done under it. We are here con-
cerned only with what has been done. The question is
what the plaintiff is entitled to for his labor, and this
depends upon the terms of the contract under which he
performed the service. Had the whole service been per-
formed, the rate of compensation would, without doubt,
be regulated by the terms of the contract. No court
would discard that contract, and resort to a *quantum
meruit*. The principle is the same as to a performance
in part."

In *Knowlman* v. *Bluett*, L. R. 9 Exch. 307, defendant
verbally agreed with plaintiff to pay her a specific sum
per annum, in quarterly installments, for caring for de-
fendant's children. *Held*, that plaintiff was entitled to
recover as for money paid at defendant's request, at the
rate fixed by the verbal agreement, even assuming that
the agreement was not to be performed within a year.

In *Mavor* v. *Pyne*, 3 Bing. 285, a contract was made for
24 numbers of a periodical work, to be delivered monthly,
at a guinea a number. Although the contract was held
void because not reduced to writing, a recovery was per-

mitted for the numbers actually delivered at the rate fixed by the contract. It is true that the court treated the contract as divisible, but it was nevertheless a void contract at its inception, and could not have been enforced, nor would a recovery have been allowed if defendant had refused to accept under it.

In *Ham* v. *Goodrich*, 37 N. H. 185, the decedent, in consideration that plaintiff would go with his family, and reside with deceased on his farm, take care of the deceased, and cultivate the farm during his life, promised that he would convey the farm. Plaintiff complied, and at the decedent's death presented a claim against the estate for his services. The court held that no action could be maintained upon the contract, but say:

"The jury were instructed by the court that they might take into consideration the agreement, and all the circumstances under which the plaintiff went to reside with his father; and under the instructions they could, had they seen fit, have given damages equal to the value of the farm. But for the court to have gone further, and said that the value of the farm must be the measure of damages,—that the jury were controlled by that,—would have been giving, in one respect, full effect to the agreement, and would have made it the foundation of the verdict. The agreement was only evidence which the jury could consider, in connection with the other testimony, as showing the circumstances under which the services were performed, which were sought to be recovered under the general counts; and to give it a conclusive effect as fixing the damages would be to make it a binding contract, obligatory upon the parties, as much so as if it were in writing."

The case was approved in the subsequent case of *Emery* v. *Smith*, 46 N. H. 151. The same rule is announced in *Burlingame* v. *Burlingame*, 7 Cow. 92, and *King* v. *Brown*, 2 Hill, 485, both of which were cases where the agreement was to compensate for the services by conveyances of land.

Our own cases do not conflict with this rule. It has been said by this court that a contract void under the

statute of frauds is a mere nullity, and cannot be used
for any purpose whatever. From an examination of
these cases, however, it will be found that the rule has
been applied only in cases where the contract was a
naked verbal contract, not only at its inception, but so
continued; an executory contract, resting entirely in
parol, unsupported by subsequent acts in recognition
thereof. *Chamberlain* v. *Dow*, 10 Mich. 319, and *Grimes*
v. *Van Vechten*, 20 Mich. 410, were actions based upon
verbal orders for goods exceeding $50 in value, and the
court held that there had been no binding acceptance.
*Hall* v. *Soule*, 11 Mich. 494, was brought upon a verbal
promise to pay the debt of another. In *Colgrove* v. *Solo-
mon*, 34 Mich. 494, Solomon had agreed with Mrs. Col-
grove to convey to her a piece of land in satisfaction of
an existing indebtedness, and before acceptance of the
deed she repudiated the agreement. In *Hillebrands* v.
*Nibbelink*, 40 Mich. 646, the father was indebted to the
son for services rendered, acknowledged the debt, and
promised that the son should have the farm. In *Liddle*
v. *Needham*, 39 Mich. 147, a father had agreed to give a
note upon the conveyance of certain lands to his son.
The court held that the verbal promise to convey the land
furnished no consideration for the promise to give the
note. The evidence tended to show that the son had
never accepted the conveyance, and that the father had
made no promise after the execution of the deed. In
*Sutton* v. *Rowley*, 44 Mich. 112, the claim was based upon
the contract, and the court say: "There is no claim that
this agreement was in writing, and there is nothing to
indicate that it could be enforced as a parol agreement
on account of facts taking it out of the operation of the
statute of frauds."

The other cases wherein the rule contended for is laid
down will be found to rest upon the same principle. In
all of these cases the contracts were not susceptible of
enforcement at law or in equity, and the application of
the rule is based upon that fact. This is made clear

by the language of the same court in *Holland* v. *Hoyt*, 14 Mich. 238, and *Scott* v. *Bush*, 26 Mich. 418. In *Holland* v. *Hoyt* the parties agreed to exchange lands. Holland delivered his deed to Hoyt. The latter refused to deliver his deed unless Holland gave his note for $1,000. Holland, protesting, gave his note, and in a suit upon the note set up want of consideration. It was insisted that, the original agreement being within the statute, the subsequent transaction must control. Mr. Justice CAMPBELL, speaking for the court, says:

"The entire transaction prior to the deeds was verbal, and, of course, if no deeds had been made, could not have been the ground of relief at law or in equity. But when a verbal contract is performed by the conveyance of land on the one part, there can be no difficulty in compelling the equivalent from the other contracting party. A court of equity can decree specific performance, if that is needed, and a court of law can allow a recovery of the purchase money, if that is all that is sought. *Thomas* v. *Dickinson*, 12 N. Y. 364. If Mr. Hoyt himself accepted Holland's deed in fulfillment of a parol bargain to exchange lands, then Holland could have compelled the exchange in equity, and Hoyt could not have refused to make it. And if Holland had a right to receive the land from Hoyt for the price already paid, it can make no difference that he could only obtain specific performance in equity. Paying or promising to pay anything more for the land would be paying for what he owned already. An equitable title is just as much property as a legal title, and, although not enforced directly in a court of law, stands on the same footing with legal titles as a consideration. And if Holland, under such circumstances, should see fit to sue for the price of his land at law on Hoyt's refusal to convey, he would recover *the value of that which Hoyt ought to have conveyed to him*."

In *Scott* v. *Bush* a verbal contract was entered into for the purchase of certain lands. The would-be purchaser paid a portion of the purchase money, and afterwards brought suit to recover back such money. The court held that, the contract being void, neither party could enforce it, and that the vendee had the right to recover as

for money received without consideration. The court, however, say:

"Some decisions have apparently disregarded this distinction between contracts made valid by part performance and stipulations or arrangements which have never become binding. *An agreement made valid by part performance is in law as valid as in equity for all purposes except the remedy to enforce it.* An equitable right is as good a consideration for a contract as a legal right."

The court also allude to the rule that a contract void under the statute of frauds is a mere nullity, and cannot be used for any purpose whatever, and say:

"We cannot conceive of such a thing as a contract which cannot be enforced as a contract, and yet can be the foundation of legal obligations *arising out of nothing else.*"

The distinction between a mere naked parol contract and a contract made susceptible by part performance of enforcement in equity is clearly pointed out, and the conclusion reached that "there is no middle ground between binding contracts, and the absence of any binding obligation." See, also, *Fuller* v. *Rice*, 52 Mich. 435; *Putnam* v. *Tinkler*, 83 Mich. 629, 638.

In the present case we are not dealing with a contract resting in parol. Under all the facts and circumstances, the jury were justified in concluding that the services were performed in reliance upon the contract, and were accepted in recognition thereof. The proof does not rest alone in parol, but upon the subsequent conduct of the parties as well,—performance on the one part, and acceptance on the other. It has frequently been held that a party admitted into possession of land under an oral contract for its purchase is entitled, upon the execution of the contract on his part, to specific performance, and that in such case the parties have so far carried the contract into effect as to validate it. *Twiss* v. *George*, 33 Mich. 253; *Davis* v. *Strobridge*, 44 Mich. 157; *Kinyon* v.

*Young,* 44 Mich. 339; *Lamb* v. *Hinman,* 46 Mich. 112; *Murphy* v. *Stever,* 47 Mich. 522; *Fairfield* v. *Barbour,* 51 Mich. 57; *Welch* v. *Whelpley,* 62 Mich. 15. In several of the cases the possession was not exclusive. The contract in the present case contemplated joint possession and operation so long as both parties should live. ⸱ There was abundant testimony tending to rebut the presumption that the services were rendered gratuitously, and the court was fully justified in submitting that question to the jury. The testimony tended to show that the services were performed with the mutual understanding that at the death of Marie L. Williams claimant should succeed to the estate, and that decedent had agreed to make a will accordingly. When a promise is made to compensate for services by will, and the promisor dies without so providing, the value of the services may be recovered as a claim against the estate. *Faxton* v. *Faxon,* 28 Mich. 159; *Sword* v. *Keith,* 31 Mich. 247; *Carmichael* v. *Carmichael,* 72 Mich. 85; *Fenton* v. *Emblers,* 3 Burrow, 1278; *Jacobson* v. *Le Grange's Ex'rs,* 3 Johns. 199; *Patterson* v. *Patterson,* 13 Johns. 379; *Martin* v. *Wright's Adm'rs,* 13 Wend. 460; *Eaton* v. *Benton,* 2 Hill, 576; *Bayliss* v. *Pricture's Estate,* 24 Wis. 651; *Jilson* v. *Gilbert,* 26 Wis. 637; *Little* v. *Dawson,* 4 Dall. 111; *Snyder* v. *Castor,* 4 Yeates, 353. When the promise rests in parol, its performance cannot be enforced in equity, if lands are to be devised (*Harder* v. *Harder,* 2 Sandf. Ch. 19; *Gould* v. *Mansfield,* 103 Mass. 408), unless under such circumstances as would justify the enforcement of a parol contract for the conveyance of lands (*McClure* v. *McClure,* 1 Pa. St. 374). But, if the contract is not within the statute of frauds, equity may compel those on whom the legal title has devolved to convey lands in fulfillment of the promise to give them by will. *Randall* v. *Willis,* 5 Ves. 262; *Fortescue* v. *Hennah,* 19 Ves. 67; *Brinker* v. *Brinker,* 7 Pa. St. 53; *Logan* v. *McGinnis,* 12 Pa. St. 32; *Mundorff* v. *Kilbourn,* 4 Md. 459.

One witness says that Mrs. Williams at one time said that "it was agreed that they were not to get married." No other witness refers to that subject. It does not appear that this was one of the conditions of the agreement, or that it was more than a conclusion arrived at by both parties. It was in response to a question as to whether anything was said as to how long they were to live together and work together.

Claimant was sworn, and testified as to the fact of an agreement in writing having been made between her mother and Thomas R. Williams; that she continued to live with Mr. and Mrs. Williams after the expiration of the term named in the contract; that her name was Sophia Smith; that Mr. Williams died in 1872, in the insane asylum at Kalamazoo; that he was taken to the asylum in November, 1871; that prior to that time Mr. Williams had gone to New York to consult a physician with reference to his eyes, and that subsequently he became blind. None of these matters were disputed, and the estate could not have been prejudiced by the testimony.

The judgment is affirmed.

The other Justices concurred.