*In re* ENGEL'S ESTATE.

ENGEL *v.* ENGEL.

1. CONTRACTS—EVIDENCE—ORAL CONTRACTS—STATEMENTS OF ONE PARTY NOT IN PRESENCE OF OTHER NOT ADMISSIBLE AS PART OF CONTRACT.

Statements of a father to third persons, not made in the presence of his son, are not admissible as part of an oral contract between the father and son whereby the son was to have the homestead if he remained at home until the father's death and assisted with the work, but they may be admitted as evidence tending to show that such a contract has been made.[1]

2. SAME—BREACH—PARENT AND CHILD—QUANTUM MERUIT.

Where the son breached the contract by leaving home before his father's death, he was not entitled to the homestead, neither could he recover against the father's estate on a *quantum meruit* basis, since the father was under

[1]Evidence, 22 C. J. §§ 166, 262, 263, 314.
On sufficiency of evidence to support a recovery for services rendered by relative or member of household, see note in 11 L. R. A. (N. S.) 879, 904.

no legal obligation to pay the son for his services except as he had contracted so to do, and his liability was measurable only by the terms of the contract.[2]

3. SAME — DIVISIBILITY OF CONTRACT — REASONABLE VALUE OF SERVICES.

Said contract, if made, was not divisible, nor was it based on reasonable value of services, since, if the father had died soon after its making, the son would have had the homestead for practically nothing, while had the father lived to an extreme old age the son's services might have far exceeded its value.[3]

Error to Kent; Dunham (Major L.), J. Submitted April 15, 1924. (Docket No. 75.) Decided October 6, 1924.

Herman Engel presented a claim against the estate of Fred Engel, deceased, for services rendered. The claim was allowed by the commissioners, and Robert Engel and another appealed to the circuit court. Judgment for defendants on a directed verdict. Plaintiff brings error. Affirmed.

*Jewell & Raymond*, for appellant.

*Smedley, Linsey & Shivel*, for appellees.

STEERE, J. Fred Engel died in Kent county, September 15, 1921, leaving an estate which was probated. His son Herman Engel filed a claim of $5,000 against the estate for services he had performed for deceased in taking charge of and managing deceased's farm, working as a farm laborer thereon from the time of his majority in 1899 until October 6, 1920, under a claimed agreement whereby deceased was to pay him for his services after he became of age by conveying to him a 40 acres of land in Wyoming township, Kent county, upon which they resided. Commissioners on claims for the estate allowed said claim at the sum of

[2]Contracts, 13 C. J. § 694; Executors and Administrators, 24 C. J. § 878; [3]Contracts, 13 C. J. § 525.

$5,000 which was affirmed by an order of the probate court. An appeal was taken from said allowance by two of deceased's children and the case re-tried in the circuit court of Kent county before a jury, where a verdict in favor of the estate was rendered by order of the court and judgment of disallowance entered thereon, with costs. Plaintiff moved for a new trial, which was denied, and has brought the case here for review on assignments of error, the important question here being whether there was testimony to carry the case to the jury.

In charging the jury the court said among other things:

"There is an abundance of testimony in this case that the father, Fred Engel, said Herman was to stay upon the farm and help with the work and when the father was through with it Herman was to have it. To others the father said Herman was to stay upon it and work the farm as long as he lived and that Herman was then to have the farm in payment for such services. And to others he stated that when Herman married that he and his wife should move to Fisher station and that Herman was then to have the farm. * * * What expressed or implied contract could be inferred under the proofs in this case as to the arrangements there between Fred and Herman? In my judgment it could be only that Herman was to remain upon the farm so long as his father lived and that upon his father's decease Herman was to have the farm. If this was the contract then Herman breached it by voluntarily abandoning the farm and his father before the contract was fulfilled on his part, namely, before his father's death. Upon this theory of the arrangement between the father and son Herman cannot recover."

For appellant it is contended there was abundant testimony of an agreement Herman was to have the 40 acres in payment for his services upon his father's death to carry that question to the jury, and even if the agreement was that Herman should remain there

with his father and help him until his death Herman could recover under the claim he filed in this case for the actual value of his services during the years he worked there, as proof of the contract would destroy the legal presumption that his services after reaching his majority were gratuitous and recovery could be had on a *quantum meruit* basis, using the express contract shown as a guide in computing the value of such services.

In support of the contention that the agreement was not qualified by a condition that Herman should remain on the farm and help his father until the latter's death counsel point out and quote excerpts from the testimony of plaintiff's witnesses to the effect Herman was to have the place in payment for his services upon the decease of his father, unqualified by any immediate statement that he was to continue the same so long as his father lived.    Taken as a whole we are unable to conclude that such is the import of the testimony of those witnesses.    Plaintiff's counsel quote as follows in support of that contention from the direct-examination of their witness Murray Beatty, who lived in Grand Rapids and said he had visited the Engel home on three occasions, the last in the summer of 1920:

"*Q.* Did you have any talk then about the possibility of Herman leaving?
"*A.* No, he didn't say anything the first time.
"*Q.* Did he at any later conversation?
"*A.* After he told me that Herman was figuring leaving the place I did talk to him, and after he stated that the place was going to him and he might as well make his home there.
"*Q.* Did he tell you for what reason the place was going to Herman?
"*A.* Well, for his work there.
"*Q.* Is that what he said?
"*A.* That is what he said."

During his cross-examination Beatty testified:

"This last talk out there was in 1920. I can't give exactly the date, it was near the fall. The old man seemed to feel kind of badly that Herman was leaving.

"*Q.* And he said Herman was to stay there and help work the place and when he was through with it he was to have it?

"*A.* Yes. sir.

"*Q.* He was to stay there and work as long as he lived?

"*A.* Yes, sir.

"*Q.* Herm was to do that?

"*A.* Yes, sir.

"*Q.* And he wanted you to go to Herm and get him to stay on with him in the same way?

"*A.* Yes, sir.    *    *    *

"*Q.* Herman was to stay there and work and help on the farm?

"*A.* Yes, sir.

"*Q.* As long as he, Mr. Fred Engel, lived?

"*A.* Yes, sir."

Plaintiff's witness Theodore Hutt said he had heard Fred Engel "mention" that "when he got through with the farm Herman was to have the farm for his pay," a good many years ago, and many times, to himself and others, testifying further in direct-examination:

"*Q.* Now, when did you have the last talk with him along that line?

"*A.* I should say it was about three years ago, I think it was.

"*Q.* And where was that talk?

"*A.* It was out at Fisher where he lived at the old homestead.

"*Q.* Right on the farm?

"*A.* Yes, sir.

"*Q.* Was Herman living on the farm at the time that last talk took place?

"*A.* No.

"*Q.* That was after Herman left?

"*A.* That was after Herman left."

He also said of that occasion that he rode out there with Herman and "the only thing I can remember,

Herman asked him whether he wasn't going to help him.  He told Herman then, he says if I get through then you can have it."   On cross-examination the witness testified:

"At that time there was a pretty heated conversation between the old man and Herman, so loud even the neighbors heard it.   The neighbors came in there. *   *   *   That was in the spring of 1921 and Herman wanted to know if his father was going to help him buy the farm.   Fred Engel was very angry at that time.   *   *   *

"I have seen Mr. Engel during all these years.   He talked with me about Herman.   He said he didn't know what he would do without Herman on the farm. He said he wanted him to stay with him there as long as he lived.   *   *   *

"*Q.* And Herman was to stay there as long as he lived?   *   *   *

"*A.* Yes.

"*Q.* He said Herman was to stay there as long as he lived, didn't he, and when he got through with the farm Herman was to have it?

"*A.* Yes, sir.

"*Q.* That is a fact, isn't it, as you understood it?

"*A.* Yes, sir.

"*Q.* That Herman was to stay there as long as he lived and when he got through with the farm Herman was to have it, is that it?

"*A.* Yes, sir.

"*Q.* And you heard that conversation several times?

"*A.* Yes, I heard that a dozen times.

"*Q.* Substantially the same when he talked with your father and mother, that was about the same?

"*A.* Yes, sir.

"*Q.* That he didn't know what he could do without Herman?

"*A.* Couldn't get along without him.

"*Q.* And that he expected Herman to stay there with him and work with him, that is with Fred on the farm, and when he got through or was through with it, Herman was to have it, is that right?

"*A.* Was to have the farm, yes.   *   *   *

"*Q.* He expected Herman to stay there?

"*A.* Yes.

"*Q.* And work on the farm?

"*A.* Yes.

"*Q.* As long as he lived?

"*A.* Yes.

"*Q.* And then when he, Fred, was through with it Herman was to have it?

"*A.* Herman was to have it for his pay."

Without quoting further, it can be safely said on this record that the testimony of plaintiff's witnesses as to what they had heard Herman's father say was not contradictory, but of similar tenor so far as what each heard went. None of those who only testified to hearing the father say Herman was to have the farm, or have it as compensation for his services, or "for his pay," after he was dead or through with it, contradict what he said to others as to Herman remaining with him on the farm and helping him as long as he lived. No witness claims to have heard the parties make any agreement. None was in writing. The law is well settled that services performed by a child for a parent, especially while at the parent's home and continuing the family relations, are presumed to be in the line of filial duty and gratuitous, but that presumption is disputable and plaintiff seeks to meet it by proof of an express oral agreement of the father to pay Herman for his services while he remained at home after reaching his majority. The proof of that agreement consists mainly of testimony as to what Herman's father said at different times in casual conversations with friends and neighbors over Herman's condition and ability.

Herman was born in Germany from where his parents emigrated to this country when he was 3 years old. At the time of this trial he gave his age as 45. He was a cripple from childhood, his right knee having been injured when he was 15 months old and that limb permanently crippled, rendering it necessary for him to use a crutch in walking from the time he

was 4 years of age.    Although hampered by his crippled limb he grew to be a healthy and industrious young man capable, as his testimony and that of others shows, of doing most kinds of work at farming and gardening, in which his father was engaged.    There were four children in the family.    A daughter older than Herman, and a son and daughter younger.    The daughters were married and left the parental home for homes of their own before they became of age. The younger son left home when between 18 and 19 years old for employment with a railroad company. Herman remained with his parents and helped his father work and manage the farm.    His father was industrious, a hard working man during all those years until his physical infirmities and age curtailed his activities.    His mother was also an able-bodied woman during most of that time but was ill for a time and in poor health when he left in October, 1920. They were apparently thrifty and fairly prosperous. Besides owning the place where he lived the father had some other resources.    The record does not show the value of his estate but it was incidentally shown that in the spring of 1920 he was having a house which he owned at Fisher station repaired and in talking with a witness named Wolters about it said, as the latter testified, that "when he got through with the old homestead then they were going to live in there and Herman was going to have the old place.    *   *   * if Herman ever got married, he said he was holding off, he had money enough to live any way and he would move in there and Herman would have the old place."

It is claimed that this is evidence of a later and different kind of agreement between Herman and his father which should have been submitted to the jury. Even if of such import, Herman never did move in there, nor offer to do so as far as shown, but when he

left home, against his father's wishes and protest, and married, he bought a house and lot in Grand Rapids, established his home and found employment there, and never visited his old home or saw his father but once again before his death.  He at that time had money and property of his own, which he had accumulated while living at the old home with his parents.  He admitted he was worth about $3,000 and defendants claim more.  This came largely from proceeds of the farm as told by himself; he bought and sold chickens, raised turkeys and chickens each year and had one-fourth of the eggs, sold butter, cut grain with his father's reaper and binder and received the pay, raised melons and squashes and other produce on the farm which he sold and had part of the proceeds, kept a bull while there and had the pay for its service, bought 20 acres of land and paid for it, owned and kept a horse on the farm and later bought an automobile, made a profit on bulls he raised and sold, etc. When he left home and married he sold his horse and kept his automobile, and had money to make a payment of $1,000 down on the home he bought in Grand Rapids where he has since resided.  He left his parents alone on the farm when the infirmities of old age had come upon them, his mother was then in poor health and, as he stated, his father "complained he could not stand work any more."

None of the statements of the father upon which plaintiff relies to establish an express agreement are shown to have been made to or in Herman's presence. They were not admissible as part of an oral contract but as evidence tending to show such a contract had been made.  Taken as a whole their tenor was, as the trial court held, to the effect that if Herman remained on the farm with his father and aided him there as long as he lived Herman was to have the farm.  This Herman did not do.  When the father died at his old home on the farm Herman had been

gone nearly a year, under circumstances indicating no desire or intention to return.

While there is room for the argument of defendants that Herman was allowed to collect and keep pay for his services while living at home and the statement made to others by his father were but gratuitous expressions precatory in their nature, of an expectation and intent that Herman would remain with him as long as he lived and he would leave him the farm, we are of the impression that whether they were of that character or of such direct and imperative terms as to show an express contract would be a question of fact for the jury had Herman remained until his father's death and fully performed upon his part, but he did not.

Neither could he recover on a *quantum meruit* basis for part performance of such contract breached by himself. The father was under no legal obligation to pay his son the reasonable value of any services rendered by the latter while living at home except as he contracted to do so, and in such case his liability arose out of the contract and was measurable only by its terms. The contract, if any, which plaintiff's testimony tended to show was not divisible nor based on reasonable value of service. If the father had died a few days after it was made the son would have had the farm for practically nothing. Had the father lived to an extreme old age the services required of the son might have far exceeded its value. As was said in *Re Colburn's Estate*, 153 Mich. 206 (18 L. R. A. [N. S.] 149, 126 Am. St. Rep. 479), a case much stronger on the *quantum meruit* theory than this, as the son died before the father while not in default:

"For the contingency which actually occurred, viz., Andrew's death before Reuben's, no provision whatever was made. * * * If they had had any such intention it is to be presumed that they would have expressed it in some way, and made some equitable

provision for a mutual protection of their rights.    In the absence of an agreement, Andrew was entitled to no compensation for his services.    The agreement provided for compensation in a certain contingency and in that contingency only.    That contingency did not occur, but another and an altogether different one occurred.    No principle of law or equity will permit the agreement to be applied to such a contingency, and it may not be presumed that the parties intended it to apply.    It follows from this reasoning that there was no testimony in the case tending to show an obligation on the part of the estate to compensate Andrew for his services."

In *Moran* v. *Beson,* 225 Mich. 144, where the daughter's death before her father's rendered impossible performance of her agreement to care for him until his death, the rule stated in the *Colburn Case* as to failure of the contingency contracted in reference to is again recognized.

Here plaintiff could but did not meet the contingency in reference to which the contract was made, and no provision was made in the contract for any compensation in case of his failure.

We think this case analogous in controlling facts and legal principles to the *Colburn Case,* and governed by it.

The judgment will stand affirmed.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.