### RIGGS *v.* RIGGS' ESTATE.

1. Husband and Wife — Contracts — Estates by Entireties — After-Acquired Estate.

A married woman, who has no separate estate, may make no valid contract during coverture to bind or affect land owned by her and her husband by the entireties as an after-acquired estate.[1]

---

[1]Husband and Wife, 30 C. J. § 559.

2. CONTRACTS—ORAL CONTRACT—CLAIM BASED UPON CONTRACT TO CARE FOR FATHER AND MOTHER UNTIL THEIR DEATH COULD NOT BE MAINTAINED AGAINST FATHER'S ESTATE DURING MOTHER'S LIFETIME.

> Where a son entered into an oral contract with his father and mother to remain upon, manage, and work the farm and care for them until both were gone when he was to have the farm, which was owned by them by the entireties, as consideration therefor, he could not maintain any claim against the father's estate, even upon a *quantum meruit*, upon the death of the father first, since his agreement was to care for them until both were gone.[2]

3. PARENT AND CHILD — SERVICES OF A CHILD PRESUMED TO BE GRATUITOUS.

> Where children, after reaching their majority, remain in the parents' home, their services are presumed to be gratuitous unless a contract for compensation is affirmatively shown.[3]

4. CONTRACTS—PARENT AND CHILD—BURDEN OF PROVING CONTRACT TO PAY SON FOR HIS SERVICES UPON HIM.

> In view of the rule that services performed by children for their parents are presumed to be gratuitous, in the absence of a contract for compensation, where a son alleged a contract with his father and mother, renewed by the mother after the father's death, whereby he was to receive the farm as compensation for caring for them until both were gone, the burden of establishing said contract was upon him.[4]

5. SAME—EVIDENCE—SUFFICIENCY.

> Evidence of the existence of a contract between a mother and her son whereby he was to care for her during the remainder of her lifetime and at her death receive the farm as compensation therefor, *held*, sufficient to present a question of fact for the jury.[5]

6. SAME—HUSBAND AND WIFE—VALIDITY OF WIFE'S AGREEMENT TO COMPENSATE SON FOR SERVICES TO HERSELF AND HUSBAND.

> Where a son orally contracted with his father and mother to care for them until both were gone, when he was to have the farm, which was owned by them by the entireties, and after the father's death the contract was

---

[2]Contracts, 13 C. J. § 787; [3]Parent and Child, 29 Cyc. p. 1630; Work and Labor, 40 Cyc. p. 2817; p. 2819; [4]Id., 29 Cyc. p. 1630; [5]Contracts, 13 C. J. § 988.

orally renewed with the mother, a claim against her estate, on the *quantum meruit*, is valid as against the contention that she could not bind herself by an oral agreement to pay for services performed during the husband's lifetime, since the consideration was a continuing one of personal service, partly past and partly future, and the executory part was sufficient to support the entire promise.[6]

7. SAME—MONEY VALUE NOT THE TEST OF VALIDITY OF CONTRACTS FOR PERSONAL SERVICES DURING LIFETIME OF CONTRACTING PARTIES—CONSIDERATION.

Inadequacy of money value, independent of other considerations, is not the test of the validity of contracts calling for the personal services of one of the contracting parties during the lifetime of the other party, but in such cases it is for the contracting parties to estimate the value and determine for themselves the sufficiency of the consideration for the promise.[7]

8. EVIDENCE—VALUE OF FARM ADMISSIBLE.

The value of the farm was competent evidence as bearing upon the value of a son's services to his father and mother, in a claim against the latter's estate based upon an oral contract that as a consideration therefor the farm should be his at their death.[8]

9. SAME—VALUE OF IMPROVEMENTS ADMISSIBLE.

Evidence of the value of improvements placed upon the farm by the son was properly admitted so that the jury could weigh it and see whether or not it corroborated his claim that there was such a promise, and the value of what he did in the light of such promise, if it came within the scope of the management of the farm.[9]

Error to Wayne; Murphy (Alfred J.), J.    Submitted April 14, 1925.    (Docket No. 80.)    Decided December 22, 1925.

Frank L. Riggs presented a claim against the estate of Abigail Z. Riggs, deceased, for services rendered. Judgment for plaintiff.    Defendant brings error. Affirmed.

[6]Contracts, 13 C. J. § 227; [7]Id., 13 C. J. § 237; [8]Evidence, 22 C. J. § 156; [9]Id., 22 C. J. § 156.

*James R. Walsh* (*Floyd W. Cone*, of counsel), for appellant.

*Frank J. Riggs* (*Ben W. Johnson*, of counsel), for appellee.

STEERE, J.   This case came to the circuit court of Wayne county on appeal from the commissioners on claims against the estate of Abigail Z. Riggs, deceased, who died October 12, 1918, at the age of approximately 84 years.   Her estate consisted of a limited amount of personal property of small value and a farm of about 100 acres located on Michigan avenue near the Belleville road in Canton township, Wayne county, shown to have a market value at the time of her death of $300 per acre, and was apparently increasing in value.   She became sole owner of it at the death of her husband, Alfred Riggs, who died April 29, 1909, at the age of 76 years.   Prior to his death the farm had stood in their joint names as tenants by entireties.   They bought and settled upon the place when her husband was about 23 years of age, spent the remainder of their lives there and raised a family of four children.   Each died at the old home and was buried from it.   When they went there the place was but partially cleared, and their residence a log house. They had two sons and two daughters.   The two younger children were born there.   Three of their children were living at the time of the trial; the names and ages of the four being stated as follows:   Mrs. Mary R. Strickland, 66 years, Frank L. Riggs (plaintiff) 64 years, Arthur Riggs (who died before his mother) would be about 60 years old if living, and Mrs. Jessie Tennant about 51 years of age.   All of the children married early in life, the oldest two each a second time after the death of the first spouse.   As they grew up they all attended the district school near by.   Plaintiff went to school more

or less until he was 18 years old.      When 15 years
of age he was of sufficient size and strength to work
efficiently on the farm and did so, only attending
school in the winter.      When 18 he was capable of
doing a man's work and thereafter remained upon
the farm, took over the heavy work, with increasing
responsibility running and managing the place with
and for his parents until both passed away.      His
brother and sisters had other ambitions and all left
the old home before they came of age.      His oldest
sister, Mary, left home when 17 years of age and
attended Normal school in Ypsilanti for about 2 years.
She taught school near home for two seasons and
after becoming of age was married, at the family
home, going first with her husband to Ohio, remain-
ing there about a year when they went to Colorado
for her husband's health, where he eventually died
of tuberculosis and she has since resided.      She en-
tered the University in that State and took a course
in dentistry, after which she opened an office in Denver
and practiced there for many years.      Of it she said
"that is my profession at the present time.      *      *      *
I followed that profession until I married a second
time and since.      Dr. Strickland is my second hus-
band."      Dr. Strickland had practiced medicine in
Colorado for 28 years and was dean of the College
of Medicine and Surgery in Denver.      The younger
sister, Jessie, left home when 17 years old after finish-
ing her school course in Sheldon.      She was employed
for a time at clerical work in Chicago and then joined
her sister in Colorado.      Aided by her sister's first
husband she entered the University there and took a
three years' course in dentistry, but did not practice
her profession as she soon was married to Dr.
Tennant, a practicing physician and surgeon in Den-
ver.      The youngest brother, Arthur, left home when
about 17 years of age, attended Normal school for

a time and later taught school, turned from that to commercial employment which he followed the remainder of his life, eventually engaging successfully in the grocery and meat business for himself. He married early and was well off when he died.

The relations between members of the family were always agreeable and friendly so far as shown until the present friction developed over their mother's estate. Those who left home early kept in touch with their parents as the years passed, by correspondence and occasional interchange of visits, but their associations, lives and active interests were in other fields and places.

Plaintiff's proofs tend to show that, as he was the only one of the children inclined to farm life and had manifested during his minority inclinations and ability in that direction, his parents held out the inducement to him that if he would stay with them on the farm, work, improve and manage it for their mutual interest, help pay an incumbrance upon it and care for them in their old age until the end, the farm should become his when they were gone. This was mutually understood and agreed upon before he reached his majority, and he shaped his future plans accordingly. After he became of age and was contemplating matrimony he talked it over again with his father in his mother's presence. With his mother's approval the previous agreement was ratified and renewed. That year he married the daughter of a neighboring farmer and took his bride to his and his parents' home where she was an apparently acceptable and useful member of the household. She died there 17 years later without issue. He continued to live at home and manage the farm as before, hiring domestic and farm help as needed, until 1905, when he married his second wife and took her to the old home with him, where they resided until both his parents passed away, and

until the time of this trial.    Two children were born
of that marriage.    The oldest was a boy who was
a great favorite of his grandmother and to whom she
was ardently attached.    In the spring of 1909, after
his father's death, when the time came to begin spring
work on the farm, Frank asked his mother if he
should go on under the same contract as before, and
she told him to go right along as he had done and
when she was through with the farm it would be
his, and he did so.    It is claimed she said this to
him in substance more than once after her husband's
death, and shown without dispute that she told it
many times to others.

The undisputed testimony showed that the father
was afflicted with chronic rheumatism for many years
before his death, and although her innate vitality
carried her to a ripe old age the mother's health was
precarious almost throughout her life.    Mrs. Strick-
land, her oldest child, said her mother had been an
invalid ever since she could remember, suffering at
times severely from indigestion and neuralgic spasms
in her digestive organs.    In her later years she
suffered from a tumorous growth upon her breast and
became a confirmed invalid.    Over two years before
her death Mrs. Strickland visited her and at her sug-
gestion she returned with her to Denver where it
was thought she would be given better and more con-
stant medical care and attendance in the homes of her
daughters.    Frank furnished the money for her
journey and later assisted her in mortgaging the farm
for $1,000 to meet her hospital, medical and other
expenses.    She underwent an operation for removal
of the tumor, which was followed by severe neuralgic
pains and other afflictions.    She remained there a
year and ten months and though kindly cared for with
the best of medical attendance and nursing her health
continued to fail, she became obsessed by a longing

to return to her old home and querulously insisted on doing so to the detriment of her health, as was thought, until finally her desire was gratified. She died a few months after her return.

While in Denver she executed her last will and testament, dated November 22, 1916, which after her death was admitted to probate in Wayne county, with Mrs. Strickland appointed executrix. In it she did not leave the home farm to Frank. He filed the claim in issue here against her estate for some $25,000, consisting of numerous items including $19,000 for 38 years of continuing personal service in working, developing and managing the farm under a claim of *quantum meruit* initiated under a contract made with his father with his mother's approval, but continued, confirmed and ratified under a contract made with his mother after his father's death. The jury found a verdict in his favor for $17,000 and judgment was entered thereon.

Defendant's numerous assignments of error are condensed and argued under the five following propositions:

"(1) Mrs. Abigail Z. Riggs, the mother, could not be bound upon any contract or agreement she made prior to her husband's death to pay the plaintiff for services already rendered or to be rendered in the future on the property which proved later to be acquired by her in her own right.

"(2) Any contract that the defendant made subsequent to April, 1909, the date of the death of her husband, to compensate for any services rendered prior to her husband's death would be void.

"(3) The court should have given an instruction to the jury that the value of the farm was permitted to be used in the evidence in order to give the jury whatever light it could as to what the value of the services were in the event that the defendant and the plaintiff contemplated that that value was the reasonable worth of the services at the time that the contract was made.

"(4) The court erred when it permitted the plaintiff over objections of the defendant to give evidence of the value of the improvements placed upon the farm such as the building of the upright on the house, the kitchen and the fence and in building and digging the well.

"(5) The motion made by the defendant at the end of the plaintiff's case to withdraw the claims in their entirety from the consideration of the jury should have been granted by the court."

The first proposition as stated may be conceded. Plaintiff's claim of right to recover, as stated in his counsel's brief, is based on an oral contract fully performed by him, made with his mother after his father died, involving "a promise of her own supported by a sufficient consideration prospective as well as retrospective."

It was early shown on the trial and conceded that the farm, which was substantially all the property they owned, was held by Alfred and Abigail Riggs by entireties as husband and wife, and she having no separate estate could make no valid contract during coverture to bind or affect it as an after-acquired estate. The father having died first, she became sole owner of the farm. Frank could then maintain no claim against his father's estate, if he had any, even upon a *quantum meruit* (*In re Engel's Estate,* 228 Mich. 385), for his agreement was to remain upon, manage and work the farm and care for the parents until both were gone. Being there upon the farm in performance of his agreement when his father died and his mother became its sole owner, as both knew, he recognized her authority and asked his mother about it. She then, as is claimed, in their home, in the presence of his wife, made a contract with him that he should go on as before, maintain the home, work and manage the farm and care for her as before until she was gone, and the farm should then be his. She was at that time a single woman, free from all

disability of coverture and sole owner of the property, legally competent to contract in relation to it as she saw fit. Plaintiff's legal right to recover was and is based upon this claimed contract made with his mother after his father's death. The court submitted that issue to the jury, and no other, except performance on plaintiff's part and the value of his services.

Defendant's last proposition is that there was no competent evidence of such contract made after the father's death to carry that issue to the jury. The court submitted it to the jury as "the controlling question in the case," referred to the filial obligations and duties which are assumed to continue when children after reaching their majority remain in the parents' home, and their services are presumed to be gratuitous unless a contract for compensation is affirmatively shown, and squarely instructed the jury upon that issue, first as follows:

"The duty then rests upon the plaintiff to satisfy you that these services were not performed gratuitously, but were performed because of a contract entered into between him and his mother; and unless you are so satisfied, your verdict would have to follow for the defendant."

Although Frank was disqualified from testifying to facts relative to the contract equally within the knowledge of his deceased mother, there was sufficient testimony to make its existence a question for the jury. Aside from what is shown by his wife's testimony as to what was said to him by his mother not long after his father's death, when the time came to begin the spring work on the farm, his wife testified to a second conversation a little later when Frank asked his mother if she had any objection to his adding a small piece of ground to their garden to make it a little larger and bring into it some lighter soil, to which she replied:

"Frank, you have always worked this place well and this place is mine now and I want you to know this place will be yours.    I want you to go on working as you have and take care of me and when I am done with it, it will be yours.    He agreed to that."

Supplemental to this is the abundance of corroborating testimony by old friends and neighbors of statements by the father in the mother's presence and by her, both before and after her husband's death, as to Frank's faithful efficiency in working and managing the farm, his remaining with and relieving them of its burdens and caring for them in their declining years, for which the place would be his when they were both gone.

In *Harris* v. *Morrison,* 100 Kan. 157 (163 Pac. 1062), a quite analogous case in numerous particulars, where defendant interposed a demurrer to plaintiff's evidence of a similar nature, and in sustaining an order overruling the demurrer the court said:

"The defendant insists that no contract between the plaintiff and C. H. Day and Anna Day or between the plaintiff and Anna Day was established by the evidence.    There was abundant evidence to establish an oral contract by which C. H. Day and Anna Day orally agreed to give to the plaintiff all the property owned by either of them at the time of their death if the plaintiff would come and live near them and take care of them during their old age.    There was abundant evidence to prove that Anna Day renewed this contract with the plaintiff after the death of C. H. Day; that the plaintiff complied with the terms of the contract; and that she moved to a home near C. H. Day and Anna Day and cared for each of them until their death."

It is defendant's further contention that if a contract was made as claimed after the father died it would be valid only for services thereafter rendered, as the mother not being primarily liable for such services during her husband's life could not thereafter bind herself by an oral agreement to pay for them.

The services rendered from the beginning until the mother died were continuous, and inured alike to the welfare of both parents. While the mother might not legally contract to that end during coverture she was an equal joint owner of the farm by entireties with her husband and an equal participant in the benefits of the services rendered by plaintiff. Contracts of this nature have special characteristics. They are contingent on death, which may come soon or late, not based on money measurement but involving principally and often entirely other valuable considerations than money. A money consideration is capable of definite admeasurement. In cases of this nature the considerations are not so definitely determinable, and it is for the contracting parties to make their own estimate of value and determine for themselves the sufficiency of the consideration for the promise. Inadequacy of money value, independent of other considerations, is not the test of validity of such contracts. Here the consideration was a continuing one of personal service, partly past and partly future, and the executory part was sufficient to support the entire promise.

"Whatever view may be taken with respect to the question whether a past benefit is a sufficient consideration, it seems that where the consideration is partly past and partly future, a single promise as to both will be sustained." 6 R. C. L. p. 673.

"A consideration which is executed in part only is called a continuing consideration and is valid, the executory portion of it being sufficient to support the entire promise." 6 Am. & Eng. Enc. Law (2d Ed.), 694.

"An agreement to render services is a good consideration for a promise to pay for past services as well as those about to be rendered." *Graham* v. *Stanton,* 177 Mass. 321 (58 N. E. 1023).

The value of the farm was concededly competent

evidence as bearing upon the value of plaintiff's services (*In re Williams' Estate,* 106 Mich. 490; *Sammon* v. *Wood,* 107 Mich. 506-511). The court when allowing testimony as to its value announced that as the ground on which it was admitted. When instructing upon the value of plaintiff's services, if the jury reached that question, the court said in part:

"If he received support for himself and his family —and it is claimed he received advantages for himself and his family * * * the reasonable value of his services then would be decreased by the advantages, the value of the support which he received from the time of his majority, 21, to the time of his mother's decease in 1918. And as bearing upon what those services were worth, the value of the farm in question at the time of the mother's death in 1918 is before you, to afford you whatever aid or light it can, if any, upon what those services were worth. You would also be entitled to consider the nature of the services rendered, whether these services entailed responsibilities, and if so, whether they were grave or slight, you would be entitled to consider what sacrifices, if any, the plaintiff made, because you are to award, if you give the plaintiff your verdict, reasonable value, reasonable pay for what he actually did throughout the time of the contractual relations."

Neither do we think there was error in permitting plaintiff to give evidence of the value of improvements placed upon the farm for the purpose to which it was limited. The court distinctly held it was not admissible as a basis of recovery, and told the jury:

"This testimony is being received so that you may have it before you and weigh it and see whether or not it corroborates the general claim of the claimant that there was such a promise as he contends was made, and what he did in the light of any such promise; if it was made, it is competent to show what he did, if it was of some value, if it came within the scope of the management of the farm; that is its only purpose." * * *

As the case was presented to the jury the old con-

tract with the father and what had been done under it were but circumstances bearing upon the mother's motives and the consideration to her in making the new contract, as claimed, after her husband's death. She was familiar with the entire situation, knew the terms of the old agreement which she had personally approved, though not legally bound by, and knew that she, her husband and plaintiff had then and through all the intervening years contemplated the service should not end until both parents died. She was strongly attached to the old home, knew the manner in which those services had been performed in the past and was desirous for them to continue.

When her husband died and the farm became hers, the old contract became impossible of performance and unenforceable, as Frank could not even remain on the place without her consent. If plaintiff's proofs are taken as true she was clear as to her rights and when he asked her about it she first answered without any qualification, "this place is now mine," then stated what her desires were, and the mother and son then made a new agreement, clear to both by reference to the old, and he continued the service as before until she passed away at the old home, he paying the funeral expenses as he had those of his father nine years before. There was abundant testimony as to his faithful service and kindly consideration for the welfare of his parents during all those years, for the jury to consider.

The case was well and exhaustively tried on those issues, and submitted to the jury by an impartial charge which we think fairly explained the issues of fact for their determination.

We find no reversible error shown and the judgment will stand affirmed.

MCDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.