PAYNE *v.* RILEY'S ESTATE.

1. EXECUTORS AND ADMINISTRATORS — CLAIM FOR SERVICES AND MONEY ADVANCED—EXISTENCE OF CONTRACT QUESTION FOR JURY. In an action by a stepdaughter against the estate of her deceased stepmother, testimony as to statements by deceased that she and her husband had agreed to give to the stepdaughter their property to pay her for services and money advanced, *held*, sufficient to take to the jury the question of the existence of a contract to that effect.

2. SAME—DAMAGES—SUFFICIENCY OF EVIDENCE. Testimony as to the character of the services rendered and money advanced to deceased and her husband, together with the value of the property which they promised to give to plaintiff to pay her for said services and money advanced, *held*, sufficient upon which the jury could have reached a reasonable conclusion as to the value thereof.

Error to Lapeer; Boomhower (Xenophon A.), J., presiding. Submitted September 13, 1927. (Docket No. 64.) Decided October 3, 1927.

Mabel Payne presented a claim against the estate of Eliza Riley, deceased, for services rendered and money advanced. The claim was allowed in part by the commissioners, and plaintiff appealed to the circuit court. Judgment for defendant on a directed verdict. Plaintiff brings error. Reversed.

*William E. Barrett* (*Glen L. Hollenbeck,* of counsel), for appellant.

*Elmer Shumar* (*Theo. D. Halpin,* of counsel), for appellee.

BIRD, J. Plaintiff, Mabel Payne, filed a claim

[1]Executors and Administrators, 24 C. J. § 1142; [2]Id., 24 C. J. § 1142.

against defendant estate for services rendered and money advanced. At the conclusion of the trial, the court took the case from the jury and directed a verdict for the estate. The trial court was of the opinion that there was no contract made out and no proofs from which damages could be found. The record shows that Mabel Payne, the plaintiff, was the daughter of Joshua Riley. Eliza Riley, his wife, was her step-mother. The Rileys lived on a farm a few miles from Manistique in 1908. Both of the Rileys were in poor health and not well to do financially. When Mabel was 14 years of age she left school and went to work in Manistique as night telephone operator. She lived at home and went back and forth to her work daily. While doing this work she helped materially in the housework. When the parents were "close up" for money she advanced money from time to time to pay taxes, to pay for coal, and to purchase groceries and other things needed in the household. When Joshua was ill, in 1921, Mabel advanced all the attendant expenses, including a hospital fee of $200. The hospital fee was returned to her, but the other items were not. In 1916 the Rileys sold their farm and moved to Imlay City, in Lapeer county. They bought a small property there, worth, as it appears, about $3,000. This was all the means they had. Shortly after the Rileys moved to Imlay City, plaintiff was married and went to Detroit to reside. After her parents moved to Imlay City she continued, after her marriage, to visit and do for them frequently, as she had done before. It appears that Mr. Riley died some time in 1921. The Rileys often talked with neighbors and friends how kind and considerate Mabel had been to them, and asserted they had an agreement with her to give her the property in payment of her kindness and the money advanced. Among the witnesses sworn was Martha Bork. She

testified as follows:    That she knew the Rileys for 25 years and while they were living in Manistique. That Mrs. Riley told the witness that Mabel would see she got some of her fancy work after death, as Mabel, the plaintiff here, was to have the property when they got through with it, that is, whatever there was left, for her work, as Mabel had done everything for them; that she, Mrs. Riley, and Josh., the husband, had promised Mabel to have it that way, and said "that is not very much pay at that."    Mrs. Riley said that they, meaning Joshua, her husband, and herself, had arranged to give Mabel Payne what there was left of the property because she was the only one left that had done anything for them.

Daniel E. Seller testified that he resided in Manistique a number of years, and while there knew the Rileys; that he knew Mabel Payne over the same period; that she worked in the telephone office at Manistique, Michigan; that he had three different conversations with Mr. and Mrs. Riley, and one with Mrs. Riley, and this was at the time Allen, the son, was sick, at Imlay City, Michigan.    They said that Allen could not get well, and they spoke of Mabel and Wesley, her husband, coming up; they were up every week or two to see them, and that Mabel Payne and her husband helped them out so much, and that Mabel was to receive the property; that after Allen, the son, had died; that Mabel had lent them money, and that Mabel was to be their heir.    And that Mrs. Riley spoke of Mabel and said that Mabel would have the property after they were through with it, and that Joshua had attended to that before he died.

Mrs. Hanner testified that she was acquainted with the Rileys and knew them while they lived in Imlay City, and that she lived near them; that she knew Mabel Payne, and that Mabel Payne frequently visited the home of Mrs. Riley when she, Mabel Payne, lived

in Detroit, Michigan, and while in conversation with Mrs. Riley, Mrs. Riley told her, the witness, that she and her husband had agreed that Mabel would have what property was left when she was through with it.

Mr. Hanner also testified that he had lived in Imlay City about 13 years and knew the Rileys before Mr. Riley died; that Mrs. Riley asked him if he knew anything about making a will; that he said she had better go to Mr. Shumar and have him draw it, and that Mrs. Riley said at that time she wanted to leave every dollar to Mabel, that was her stepdaughter. Mrs. Riley said "She has been an awful good girl to me and I promised Josh.," that is her husband, "that I would have every dollar left to Mabel;" it had been talked before while he, Joshua, was alive, that Mabel Payne was to have what was left for helping out, at times, "stood by them," is the way she worded it, Mrs. Payne had always, before she got married, and afterwards; that the property the Rileys had was joint property, and that the deed was a joint deed. The witness further said that he knew personally that Mrs. Payne had spent money to help Mrs. Riley, and Mrs. Payne was to buy the coal when they left Mrs. Riley's; that Mrs. Payne paid him for the coal the day he moved out.

Wesley Payne testified that he was acquainted with the Rileys during their lifetime. He testified that he loaned the Rileys $200 to buy coal and pay their taxes and purchase other things. He further testified that when the Rileys discussed the matter they said it was understood that Mabel was to have the property, and that no one else was to get it; that she, Mabel Payne, was to have the property for the work she had done for them all the way through. That Mrs. Riley further said: "Well, you know you are going to get this money all back." She said that a lot of times.

Mrs. Angie Peasley was sworn. She testified that she knew Eliza Riley; that she was employed to take care of her during an illness in the spring of 1922; that she was there three weeks; that Joshua Riley was dead at the time; that Mabel Payne employed her to go there, and that she, Mabel Payne, paid her for the time she spent there; that she heard Mrs. Riley speak of an agreement that she had with Mabel Payne, and Mrs. Riley said that Mabel had always helped her; that she was to have the property to reimburse her for what she had done; and that an agreement had been made to this effect before Mr. Riley died. Upon cross-examination she testified that Mrs. Riley said that she and Josh. had always talked that Mabel was to have the property that was left at their death for the work and money she had advanced to them from time to time.

Jesse Riley testified that on one occasion when he was there his stepmother told him that Mabel had worked in the telephone office and had even taken her wages to pay the taxes on the farm, and that she had given the money to help pay for groceries, etc., while in Manistique, and that the farm in Manistique was sold and the money received therefrom bought the property in Imlay City, and that the deed to the property in Imlay City was a joint deed.

We are of the impression that from the foregoing testimony claimant made a case for the jury. The statement of the Rileys that they were going to give Mabel the property is not of much force if they did not do so. It was simply a statement of an unexecuted intention, but when they said they were going to give the property to Mabel to pay her for all she had done for them and for money advanced in their extremity, and that they had an agreement to that effect, it shows they intended to pay for the services and to repay the amount she had advanced to them. These

statements were made before and after the death of Mr. Riley.    We think the court was in error in concluding that there was no testimony from which a contract could be found.    *In re Williams' Estate,* 106 Mich. 490; *In re Clark's Estate,* 234 Mich. 471, and cases cited.

The trial court was also of the opinion that there was no testimony that could be used to compute damages.    It was in evidence that the Imlay City property was worth approximately $3,000.    This was the property that was intended to be given to plaintiff.    This was some evidence of the value that the Rileys placed upon her services and the money she had advanced to them.    *Riggs* v. *Riggs' Estate,* 232 Mich. 579.

From the character of the services and the advancements of money, together with the value of that which was intended to be given to her, the jury could have reached a reasonable conclusion as to the value of her services.

The judgment is reversed and a new trial granted, with costs to the plaintiff.

SHARPE, C. J., and SNOW, STEERE, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.